IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**EMELY CAMACHO,**                    Case No. 1:17 CV 222

    Plaintiff,                    Judge Sara Lioi

    v.                    Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                    REPORT AND RECOMMENDATION

## INTRODUCTION

Plaintiff Emely Camacho ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny supplemental security income ("SSI"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated February 3, 2017). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded.

## PROCEDURAL BACKGROUND

Plaintiff filed for SSI in January 2014, alleging a disability onset date of August 1, 2009. (Tr. 127-37). Her claims were denied initially and upon reconsideration. (Tr. 91-93, 99-100). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 104). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on December 8, 2015. (Tr. 29-66). On February 3, 2016, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-24). The Appeals Council denied Plaintiff's request for review, making

the hearing decision the final decision of the Commissioner. (Tr. 1-7); *see* 20 C.F.R. §§ 416.1455, 416.1481. Plaintiff timely filed the instant action on February 3, 2017. (Doc. 1).

## FACTUAL BACKGROUND

<u>Personal Background and Testimony</u>

Plaintiff was born in January 1982 and was 31 years old on her application date. (Tr. 22). Plaintiff's mother drove her to the hearing. (Tr. 38). Plaintiff lived with her five children, aged 17, 15, 14, 12, and 9. (Tr. 41). Her oldest daughter and her mother, who lives nearby, helped her care for her other children. *Id.* Plaintiff testified to past work as a house cleaner. (Tr. 46).

Plaintiff described the reasons she believed she was unable to work:

> It's very hard for me . . . to focus and to concentrate on doing any type of work or any type of pay. . . . I feel like everybody's, like, looking at me while I'm . . . when I'm doing things. . . . I have severe tics, and it's just . . . a problem. . . . , I distract everybody from too much tics that I do.

(Tr. 38-39). Plaintiff had tics in her face, neck, arms, and legs, "every day, like constantly." (Tr. 39). The tics increased in severity when Plaintiff was "more stressed out." *Id.* When questioned about an inconsistency in the record where a provider observed no tics until tics were mentioned, Plaintiff explained:

> I always - - like, my tics are always - - I always have tics. There's time periods where I could, like not have tics, like for a time period, but not like - - like, for long time periods. Like, it's just like - - I could - - like if I'm relaxed, I could [have] tics but not as major. But I always tend to have tics, like severely all the time every day.

(Tr. 40-41). Plaintiff testified the longest she could go without having a tic was "a couple minutes" and talking or thinking about tics made them worse. (Tr. 47).

At the time of the hearing, Plaintiff took Lamictal and Topamax. (Tr. 41-42). The medications caused drowsiness and Plaintiff slept a lot. (Tr. 44); *see also* Tr. 45 ("I just sleep . . . almost . . . all day. Like, I'm constantly tired all the time.").

Plaintiff testified her mother and oldest daughter helped with house cleaning. (Tr. 47-48). Plaintiff stated she could sweep or mop, but "it just takes me more time to do it." (Tr. 48). Plaintiff testified it took her longer to do these things than it used to, but acknowledged she had always had tics. (Tr. 48-49). Plaintiff washed dishes, but worried she might drop things, and had broken dishes before. (Tr. 50-51). Once while cooking, Plaintiff dropped a pot on the floor. (Tr. 51).

Plaintiff testified to having obsessive compulsive disorder symptoms including repeatedly checking her door locks, her stove, and whether her children were breathing. *Id.* She would check the door and the stove three or four times a day, and check her children's breathing whenever they were sleeping. (Tr. 52). She also arranged her children's shoes from smallest to biggest. (Tr. 51-52).

Plaintiff had trouble concentrating, and worried about others making fun of her or being distracted by her. (Tr. 53). Plaintiff testified she did not go anywhere, and did not like being around people. *Id.* She clarified that she takes her children to school with her oldest daughter, and goes grocery shopping with her mother. (Tr. 54). She was teased due to her tics, and had pain in her face and neck from the tics. (Tr. 57).

Plaintiff testified she had been seeing Dr. Pandya for "maybe a year or so". (Tr. 42). Plaintiff testified that she saw Dr. Pandya on the day she gave him a mental impairment questionnaire in November 2015. (Tr. 43-44). Plaintiff did not feel like she was getting better under Dr. Pandya's treatment and she was "going to be seeing a new doctor because Dr. Pandya is leaving". (Tr. 55).

<u>Relevant Medical Evidence</u>[1]

In March 2011, Plaintiff saw Erick Kauffman, M.D., at Neighborhood Family Practice, for bipolar disorder and Tourette's disorder. (Tr. 264). She reported being off all medications, but that Lamictal had previously helped make her calmer, and Clonidine "helped [T]ourette['s a bit". *Id.* On examination, Dr. Kauffman noted normal: mood and affect, behavior, and thought content. (Tr. 265). He prescribed Lamictal and Klonopin for Plaintiff's bipolar disorder and Clonidine for her Tourette's. *Id.*

In April 2011, Plaintiff complained of aching epigastric pain with nausea and vomiting. (Tr. 262). Plaintiff reported stopping the Lamictal, but it "was helping mood and reactivity" and she wanted to restart it. *Id.* Dr. Kauffman again noted normal: mood and affect, behavior, and thought content. *Id.*

In June and August 2011, Plaintiff called to request a refill of, *inter alia*, Klonopin (clonazepam). (Tr. 261). In September 2011, Plaintiff called to request a psychiatric referral, which Dr. Kauffman approved. (Tr. 260).

At an October 2011 visit with Dr. Kauffman, Plaintiff reported anxiety, panic attacks, and poor sleep. (Tr. 258-59). Dr. Kauffman noted plaintiff was nervous and anxious and had insomnia. (Tr. 259). Dr. Kauffman prescribed Klonopin, and citalopram (Celexa), and instructed Plaintiff to follow up "with psych or me in one month". *Id.*

---

1. Although Plaintiff alleges disability as of August 2009, SSI benefits are only payable after the filing of an application. *See* 20 C.F.R. §§ 416.305(a); 416.330(b). Thus, the relevant time period at issue is between Plaintiff's filing date of January 15, 2014, and the ALJ's decision date of February 2, 2016.

In December 2011, Plaintiff called requesting refills of Lamictal and Klonopin. (Tr. 258). Plaintiff also reported she had previously taken Seroquel and requested a refill. *Id.* Plaintiff was informed Dr. Kauffman would address these refills at her next office visit. *Id.*

Plaintiff next saw Julia Garcia, MA (in the same office as Dr. Kauffman) later that month. (Tr. 257). Plaintiff reported "[f]unctioning well when she is on lamictal", but she had "been off it for 2 weeks." *Id.* Plaintiff was prescribed Klonopin (clonazepam) and quetiapine (Seroquel), and notes indicate "[w]ill work on psych meds until she is seen by psych". (Tr. 258). In January, Plaintiff again called Dr. Kauffman for a refill of Klonopin. (Tr. 256).

In February 2012, Plaintiff saw psychiatrist Sara Stein, M.D. (Tr. 255-56). Plaintiff reported she had been diagnosed with bipolar disorder ten years prior, and had occasional suicidal feeling and panic attacks. (Tr. 255). Plaintiff also reported a previous diagnosis of Tourette's. *Id.* Plaintiff reported she was taking Lamictal, never started citalopram, and took clonazepam for anxiety. *Id.* On examination, Plaintiff was anxious, had "obvious motor tics" and her speech was pressured. (Tr. 256). Dr. Stein assessed bipolar disorder, and Tourette's, and assessed a Global Assessment of Functioning ("GAF") score of 60.[2] *Id.* Dr. Stein adjusted Plaintiff's medications (increasing her Lamictal dosage, and adding trazodone). *Id.*

In May 2012, Plaintiff returned to Dr. Kauffman for a "medication review". (Tr. 252). Plaintiff reported she was pregnant, and had stopped taking her Klonopin and Lamictal two weeks

---

2. Even though GAF scores were eliminated in the Fifth Edition of the DSM-V, which was published in 2013, the Sixth Circuit has since explained that GAF scores still "may assist an ALJ in assessing a claimant's mental RFC." *Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 835 (6th Cir. 2016). In the Sixth Circuit, courts are directed to "take a case-by-case approach to the value of GAF scores." *Id.* at 836. A GAF score of 60 indicated "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers.")." DSM-IV-TR, at 34.

prior. *Id.* Dr. Kauffman again noted normal: mood and affect, behavior, and thought content. *Id.* Dr. Kauffman referred Plaintiff to behavioral health. (Tr. 252-53). Later that month, Plaintiff told Dr. Stein she had stopped all her medications three weeks prior, and that she had racing thoughts and could not sleep. (Tr. 251). Dr. Stein prescribed a low dose of Haloperidol, noting it was safest for pregnancy. *Id.*

In June 2012, Plaintiff called Dr. Kauffman to request a Lamictal refill. (Tr. 250). Plaintiff also reported she was no longer pregnant and had an appointment with Dr. Stein the following day. (Tr. 250-51). Plaintiff did not show up for her appointment with Dr. Stein, and Dr. Stein requested a staff member call her to request she come into the office. (Tr. 251).

In October 2012, Plaintiff saw Dr. Stein, reporting a lost pregnancy, difficulty sleeping, "[b]ad tics", and racing thoughts. (Tr. 248). Dr. Stein adjusted Plaintiff's medications (restarting Lamictal, increasing haloperidol, and adding vitamin B6). *Id.*

Records reflect prescription refills from both Dr. Stein and Dr. Kauffman from January through June 2013. (Tr. 247). In June 2013, Plaintiff called Dr. Kauffman requesting a Klonopin refill, and was instructed to make an appointment. *Id.* Plaintiff saw Dr. Kauffman later that month, reporting stress from relationship issues, caring for her children alone, and wanting to get back on medications. (Tr. 245-46). Dr. Kauffman noted Plaintiff was depressed, nervous, and anxious. (Tr. 246). Dr. Kauffman restarted Plaintiff's medications (adding Doxepin), and referred Plaintiff to counseling. *Id.*

Plaintiff called Dr. Kauffman later in June and again in July, reporting the Doxepin dosage was too strong and made her sleepy. (Tr. 244-45). Plaintiff was instructed to take half a tablet, and later given a prescription for a lower dose. (Tr. 245).

In December 2013, Plaintiff called Dr. Kauffman's office requesting refills of Lamictal and Klonopin until her appointment in January. (Tr. 244).

In January 2014, Plaintiff saw Dr. Kauffman for a physical, and reported she continued to suffer from depression and insomnia. (Tr. 242). She also reported the Doxepin "makes her too drowsy." *Id.* On examination, Dr. Kauffman noted Plaintiff was "[p]ositive for depression", and was "nervous/anxious and ha[d] insomnia." *Id.* She was, however, noted to have a normal mood and affect. (Tr. 243). Dr. Kauffman prescribed Elavil. (Tr. 240-41). She called two weeks later, requesting a refill of Doxepin, and stating the Elavil was not helping with sleep. *Id.* The following day, Plaintiff called back, stating the prescribed Doxepin dose was too strong. (Tr. 240). Dr. Kauffman's office also recommended Plaintiff "set up an intake time with behavioral health". *Id.*

Also in January 2014, Plaintiff began treatment with Jane Harris, L.I.S.W. (Tr. 287). Plaintiff reported suffering from Tourette's since age 12, anxiety, depression, and OCD. *Id.* She reported symptoms of aggressive behavior, agitation/irritability, crying spells, distressed mood, distractibility, hypervigilance, general anxiety, hyperactivity, impaired memory, lack of interest in activities, low energy, nightmares, obsessions/compulsions, paranoia, phobias, poor concentration, poor impulse control, racing thoughts, sleep disturbances, and thoughts of death. (Tr. 287-93). Plaintiff reported previously taking several medications for her mental health problems, but had discontinued several due to ineffectiveness or side effects. (Tr. 296-304). She was currently taking Doxepin for sleep and depression (though it made her sleepy during the day) (Tr. 297), Klonopin for anxiety, and Lamictal for depression (Tr. 299). Ms. Harris noted Plaintiff had trouble concentrating, and was "not prepared to spend the time required", but "was cooperative and engaged." (Tr. 313). Ms. Harris noted Plaintiff yawned throughout the session, and had facial tics. *Id.* Plaintiff failed to attend two sessions in February, and cancelled one. (Tr. 314-16).

Plaintiff saw Ms. Harris three times in March 2014. (Tr. 318-20). Plaintiff reported anxiety and depression increasing after the death of a family member, and Ms. Harris noted Plaintiff was doing "[w]orse." (Tr. 318). Ms. Harris noted Plaintiff reported medication compliance, but "then admitted she was partially med compliant off and on." *Id.* Ms. Harris encouraged Plaintiff to address her diet, medication compliance, and caffeine and nicotine intake. (Tr. 320). In April 2014, Plaintiff saw Ms. Harris to discuss anxiety and depression triggers. (Tr. 321). Plaintiff agreed to practice anger management techniques. *Id*. Plaintiff did not show up for her next appointment. (Tr. 338).

Later that month, Plaintiff saw nurse practitioner Maureen Sweeney and received a prescription for Effexor. (Tr. 349). The following day, Ms. Harris observed Plaintiff "was exhibiting full blown Tourette's symptoms" at the beginning of the session, but also that Plaintiff "was able to go w[ithout] facial and neck spasms for a few min[utes] during the session w[ithout] any medication.". (Tr. 339). Plaintiff reported being unable to sleep at night, and paranoia, including avoiding windows "for fear of someone shooting her through the windows." *Id.* Ms. Harris emphasized taking Effexor as prescribed, and advised Plaintiff to obtain a referral to a neurologist for her Tourette's. *Id.* Plaintiff cancelled her next appointment. (Tr. 340).

At the end of April 2014, Ms. Harris met with Ms. Sweeney "to discuss [Plaintiff's] response to [Ms. Sweeney's] refusal to prescribe medication for Tourette's." (Tr. 337). Ms. Harris reported Ms. Sweeney told her she "saw no symptoms of Tourette's until she asked about it and [Plaintiff] began to exhibit twitching and tics." *Id.* The providers agreed Plaintiff should not be prescribed medication until a neurologist provided a Tourette's diagnosis. *Id.*

Plaintiff again saw Ms. Harris in May 2014, reporting she had stopped taking Effexor because she felt like "she was going to black out." (Tr. 341). Ms. Harris provided coping

techniques, and noted Plaintiff had made "[m]inimal [p]rogress." *Id.* Ms. Harris observed Plaintiff "was able to understand how re-framing the negative into the realistic and positive can help her to manage her symptoms of anxiety and depression" and she "could laugh and stop the facial twitching with so[me] of [Ms. Harris's] examples and stories." *Id.*

Plaintiff returned to Dr. Kauffman a few days later, reporting increased tics and depression. (Tr. 370). Plaintiff reported she had stopped taking all psychiatric medication except Klonopin, and that Lamictal worked well for two years, but then she developed a rash. *Id.* Dr. Kauffman noted Plaintiff was nervous, anxious, and depressed, but also noted she had a normal mood and affect, and normal behavior. (Tr. 370-71). Dr. Kauffman prescribed topiramate, citalopram, and clonazepam for Plaintiff's bipolar disorder. (Tr. 371).

Later in May 2014, Plaintiff told Ms. Harris she had been prescribed "Celexa and Topamax and was "seeing an improvement already", "thinking more clear[ly] and emotions are calmer." (Tr. 344). Plaintiff missed her next two appointments with Ms. Harris. (Tr. 345-46).

In May 2014, Plaintiff saw neurologist Scott Cooper, M.D., Ph.D., on referral from Dr. Kauffman. (Tr. 326-29). Dr. Cooper assessed generalized anxiety disorder, and noted Plaintiff's Tourette's Disorder Scale score was 59. (Tr. 329).

In July 2014, Plaintiff saw Heather Ways, M.D., at Neighborhood Family Practice. (Tr. 366-67). She noted a review of Ohio Automated Rx Reporting System (OARRS), showed a prescription for Klonopin since September 2013, and that Plaintiff had received eight prescriptions from four doctors since then ("4 for clonazepam, tramadol, oxycodone and hydrocodone also."). *Id.* On examination, Plaintiff had a normal: mood and affect, behavior, judgment, and thought content. (Tr. 367). Dr. Ways assessed anxiety and bipolar disorder, prescribed clonazepam (Klonopin) and citalopram (Celexa), and ordered a toxicology screening. *Id.*

Less than two weeks later, Plaintiff saw Dr. Kauffman again. (Tr. 363-65). On examination, Dr. Kauffman noted Plaintiff was anxious. (Tr. 364). He assessed bipolar disorder and Tourette's disorder, prescribed medication, and instructed Plaintiff to follow up with a movement disorder specialist. (Tr. 365). Two weeks later, Plaintiff saw Dr. Ways, reporting possible side effects of Topamax, including increased tics and arm tingling. (Tr. 358). Plaintiff reported she previously had side effects on Celexa, then changed to Wellbutrin, and then felt her tics got worse. *Id.* On examination, Dr. Ways noted "multiple facial movements, head also", but normal mood, affect, behavior, judgment, and thought content. (Tr. 359). She assessed Tourette's disorder and bipolar disorder. *Id.*

Two days later, in August 2014, Plaintiff told Dr. Kauffman she stopped taking Wellbutrin because she had increased tics, she had side effects on Celexa, and Topamax "made her too spacy." (Tr. 356). He noted Plaintiff continued to struggle with mood issues. *Id.* On examination, Dr. Kauffman noted facial tics, but a normal mood and affect. *Id.* He adjusted Plaintiff's medications, providing a trial of Haldol "only to clarify response to med[ication]", referred Plaintiff to behavioral health, and instructed Plaintiff to follow up with a movement disorder doctor. (Tr. 357).

In October 2014, Plaintiff returned to Dr. Cooper, who observed frequent, but mild tics ("mostly eyeblinking, less often lower facial grimacing, occasional neck or shoulder shrug"). (Tr. 396). He noted Plaintiff reported Topamax seemed to be helping with the facial tics, but had increased side effects at a higher dosage. *Id.* Dr. Cooper re-started the Topamax, but "keeping below the side effect threshold". *Id.* The following month, Plaintiff called to report eye and lip twitching, and arms and legs falling asleep since increasing her Topamax dosage. (Tr. 401). She was advised to return to the previous lower dosage. *Id.*

In November 2014, Plaintiff saw Ann Chandy, M.D., at the Cleveland Clinic for a neuromodulation consultation at the referral of Dr. Cooper. (Tr. 403).[3] Plaintiff reported tics starting at age 13, which worsened in her twenties. *Id.* Plaintiff reported the tics "cause[] her pain" and that she "can't relax or stay still." *Id.* "Sometimes the tics are so bad that when she is driving she unintentionally kicks the brake or the accelerator." *Id.* Plaintiff also reported a diagnosis of depression in 2006 after a separation from a boyfriend, but she had since "had repeated episodes which have gradually become more frequent". (Tr. 404). On examination, Dr. Chandy noted Plaintiff had tics in her upper body, face, and legs. (Tr. 405). Plaintiff made good eye contact, was cooperative, her insight was intact, and judgment was good. *Id.* Plaintiff's mood was anxious and depressed, her memory was slightly impaired, but her thought process was logical, coherent, and rational. *Id.* Dr. Chandy assessed depressive disorder, generalized anxiety disorder, and Tourette's syndrome. *Id.* She prescribed Seroquel for sleep, anxiety, and mood swings, noting Plaintiff reported it helped in the past. *Id.*

In December 2014, Plaintiff called and reported the Seroquel made her too drowsy, and wanted to discuss new medication options. (Tr. 410). Mayur Pandya, D.O., called her back and prescribed Latuda. *Id.* In January 2015, Plaintiff again called with questions regarding her medication. (Tr. 414). Plaintiff told Dr. Pandya she was apprehensive about taking Latuda, and inquired about a re-trial of Lamictal (noting she had taken it before with good results, and discontinued due to a rash). *Id.* Dr. Pandya prescribed the Lamictal, and instructed Plaintiff to schedule an appointment in four weeks. *Id.*

---

3. Although this record is signed by Dr. Chandy (Tr. 403), there is also a staff note indicating: "Key elements of history & examination above confirmed by me during interview with patient. Agree with diagnosis and treatment plan. Will initiate Seroquel to target mood and tics, along with sleep. My final recommendations will be communicated back to the referring physician and/or the patient . . . . Mayur Pandya, D.O." (Tr. 405-06).

In February 2015, Plaintiff again called Dr. Pandya's office requesting to try Latuda because she was worried about getting a rash from Lamictal. (Tr. 416). The physician advised her to call the pharmacy as Dr. Pandya had written a prescription for Latuda in December. *Id.*

In March 2015, Plaintiff returned to Dr. Kauffman for medication refills. (Tr. 351). She reported continuing tics in her face and neck. *Id.* She was taking Lamictal "with ramping doses", was not sure if it worked when she was on it in the past, and that she had developed a rash at one point. *Id.* On examination, Dr. Kauffman noted Plaintiff was stressed. He assessed anxiety, Tourette's, and bipolar disorder. (Tr. 352). He increased Plaintiff's Lamictal dosage, continued Cymbalta, and noted it was "[u]nclear how to reduce tics." *Id.*

In April 2015, Plaintiff again called Dr. Pandya to discuss whether it was okay for her to take the prescribed Cymbalta. (Tr. 418). Dr. Pandya called her back, noted she reported still feeling depression and anxiety, and advised they should "optimize Lamictal" before she added Cymbalta. *Id.* Later that night, Plaintiff called a nurse on call at Dr. Kauffman's office, reporting ankle swelling and back pain that she thought might be related to an exercise injury. (Tr. 420). She was referred to the emergency room. *Id.*

In June 2015, Plaintiff again called Dr. Pandya reporting Lamictal and Klonopin were "not working for her", and that she wanted to discuss other medication options before her scheduled August appointment. (Tr. 422). Dr. Pandya called her back and made an appointment for the following week. *Id.* At that appointment, Plaintiff reported her facial tics were the worst, driving had become more difficult, and that she could not go places because of embarrassment. (Tr. 423). Dr. Pandya noted Plaintiff stopped Tenex, could not tolerate Seroquel, and never took the Latuda he suggested. *Id.* Plaintiff was taking Lamictal, which helped her crying spells. *Id.* On examination, Plaintiff had eye, face, and neck tics. (Tr. 424). She was cooperative, but her mood was anxious

and depressed, and her affect appeared blunted. *Id.* Dr. Pandya restarted Tenex, and increased Plaintiff's Lamictal dosage. (Tr. 425).

Plaintiff called Dr. Pandya again in July 2015 regarding her medications, saying "she needs something stronger." (Tr. 427). Plaintiff told Dr. Pandya she did not feel like the Lamictal or Tenex had helped with her tics or anxiety and it was interfering with her sleep. *Id.* Dr. Pandya prescribed Neurontin, and "[i]f no benefit, we can consider Topamax again". (Tr. 427-28).

In August 2015, Plaintiff saw Dr. Pandya for a medication check. (Tr. 429). Plaintiff reported some improvement with a higher dosage of Neurontin, and was "[i]nterested in restarting Topamax due to weight issues/impulse control benefit in the past." *Id.* On examination, Dr. Pandya noted Plaintiff's memory was intact, concentration was preoccupied, and thought process was circumstantial. (Tr. 430). He noted Plaintiff had good eye contact, and rapport "was quite easy to establish." *Id.* Her mood was dysthymic and anxious, affect constricted, insight somewhat limited, and judgment fair. *Id.* Dr. Pandya noted slight improvement (Tr. 429), added Topamax, and instructed Plaintiff to continue Neurontin, Lamictal, and Klonopin (Tr. 430).

In September 2015, Plaintiff called reporting depression and sleep difficulties. (Tr. 433). Dr. Pandya prescribed sleep medication Remeron. *Id.*

In November 2015, Dr. Pandya noted Plaintiff tolerated Topamax, and had a brief reduction in tics, thought they were "still prominent". (Tr. 437). Her mood and anxiety were noted to be more stable. *Id.* Plaintiff reported her eye-blinking, shoulder, and arm tics impair her ability to drive and function, and Dr. Pandya noted she was frustrated by "lack of robust efficacy from interventions thus far". *Id.* On examination, Dr. Pandya noted Plaintiff had face, eye, and arm tics. (Tr. 438). She was cooperative and had fair eye contact, but her mood was anxious, affect was constricted, insight was adequate, and judgment was fair. *Id.* Her memory was intact, but her

concentration was preoccupied and "[a]nxiety interferes." *Id.* Dr. Pandya referred Plaintiff for a functional capacity assessment based on her Tourette's. (Tr. 439).

<u>Opinion Evidence</u>

*Consultative Examiner Dr. Deardorff*

In April 2013, Paul Deardorff, Ph.D., examined Plaintiff at the request of the state agency. (Tr. 196-203). Dr. Deardorff observed Plaintiff was polite and cooperative during the examination. (Tr. 199). She had facial and vocal tics and "appeared to be anxious as she maintained only variable eye contact and sighed at times as if to calm herself." *Id.*; *see also* Tr. 197 ("Throughout the evaluation she displayed frequent facial and vocal tics.") Plaintiff was "preoccupied with her difficulties" and anxious. (Tr. 200). With regard to Plaintiff's cognitive functioning, Dr. Deardorff noted Plaintiff's remote recall was adequate, but her "short-term memory skills were not strong". *Id.* Her reasoning abilities "appeared to be marginally adequate". *Id.* Dr. Deardorff assessed chronic motor or vocal tic disorder, generalized anxiety disorder, and mood disorder, not otherwise specified. (Tr. 201). Under "Prognosis", Dr. Deardorff wrote: "Given that she has been involved with the mental health system from 2007 but appears to remain significantly anxious, prognosis is not strong. Her Tic Disorder undoubtedly contributes heavily to her emotional discomfort." (Tr. 202).

In his functional assessment, Dr. Deardorff opined Plaintiff had "no difficulty" responding to simple questions or following simple instructions, but her short-term memory was poor. *Id.* He observed Plaintiff was "very anxious" interacting with him, she "believes others look at her and talk about her as a result of her Tic Disorder", and "[s]he stated that she has difficulty interacting with others at school and on the job due to her belief that she is ridiculed by others." *Id.* With regard to Plaintiff's abilities to respond appropriately to work pressures, Dr. Deardorff again noted

Plaintiff "appeared to be very anxious", and that "[s]he stated that she has failed to report to work on many occasions due to her fear that she would be ridiculed by others". (Tr. 203). He also noted "her comments were suggestive of panic attacks, avoidant behavior, and symptomatology somewhat suggestive of PTSD." *Id.*

### State Agency Reviewing Physicians

In April 2014, stage agency physician Roseann Umana, Ph.D. reviewed Plaintiff's records. (Tr. 72-75). She concluded Plaintiff could: "perform simple and routine tasks that are not fast paced in nature"; "interact with the general public, coworkers, and supervisors on no more than a superficial basis"; and "perform in a static work environment that does not require strict production demands." *Id.*

In September 2014, state agency physician Karla Voyten, Ph.D., reviewed Plaintiff's records and affirmed Dr. Umana's opinion. (Tr. 85-87).

### Treating Physician Dr. Pandya

In November 2015, Dr. Pandya completed a "Mental Impairment Questionnaire". (Tr. 435-36). He listed Plaintiff's diagnoses as major depressive disorder, Tourette syndrome, and adjustment disorder with anxiety. (Tr. 435). He listed Plaintiff's medications and noted they cause side effects of drowsiness and sedation. *Id.* In response to a question about the clinical findings that demonstrate the severity of Plaintiff's mental impairment, Dr. Pandya wrote that Plaintiff "has a diagnosis of Tourette Syndrome with severe tics and mood instability" and her prognosis was "[l]imited/[g]uarded". *Id.* He opined Plaintiff could carry out simple and detailed instructions, and sustain an ordinary routine without special supervision, but would be seriously limited in her ability to maintain attention and concentration for extended periods, and limited in her ability to perform activities within a schedule, work with others, and maintain regular attendance. *Id.* He

opined Plaintiff would be unable to meet competitive standards for completing a normal workday and workweek without interruptions from psychologically based symptoms. *Id.* He opined Plaintiff had no understanding or memory limitations, and no adaptation limitations. (Tr. 436). Dr. Pandya opined Plaintiff would be seriously limited in her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, but would have no limitation in interacting with the public, supervisors, or maintaining socially appropriate behavior. *Id.* Dr. Pandya opined, on average, Plaintiff's impairments would cause her to be absent from work "5-7 days/week" and she would be off-task for more than 50 percent of an eight-hour workday. *Id.*

*Physical Therapist Matt Sutliff*

In November 2015, physical therapist Matt Sutliff of the Cleveland Clinic performed a functional capacity evaluation to assess Plaintiff's vocational ability. (Tr. 441). Physical testing showed no limitations in Plaintiff's ability to sit, stand, or walk. (Tr. 445-46). Mr. Sutliff noted Plaintiff had "limited skills and an 8th grade education, but she is physically able to perform gainful work." (Tr. 44). Additionally, he noted that "[w]hile her tics are distracting for her, they do not prevent her from performing vocational tasks nor activities of daily living." *Id.*

VE Testimony

A VE appeared and testified at the hearing before the ALJ. (Tr. 58-63). The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background who:

> has the ability to perform simple and routine tasks that are not fast paced. That person has the ability to . . . interact with the general public, coworkers, and supervisors superficially. And superficial means the job cannot require arbitration, negotiation, conflict resolution, management, or supervision of others or being responsible for the health, safety, or welfare of others.
>
> That person retains the ability to perform in a static work environment that does not require strict production demands.

(Tr. 59). The VE opined such an individual could not perform Plaintiff's past work, but could perform other jobs, namely: housekeeper, dishwasher, and groundskeeper. (Tr. 60). The VE also opined that being off-task for more than ten percent of the workday or being absent more than one day per month would be problematic in a person sustaining employment. (Tr. 61).

The VE also opined that a limitation to a "non-public work setting" (defined as "a position that wouldn't normally be open for the general public to be traversing through") would not change his answer to the hypothetical question. (Tr. 61-62).

Plaintiff's counsel then asked the VE to add a restriction to "no more than 5 percent of the work day - - interaction with coworkers and supervisors to avoid disrupting the work place." (Tr. 62). The VE replied there would be no jobs for such an individual. *Id.*

ALJ Decision

In a decision dated February 3, 2016, the ALJ first concluded Plaintiff had not engaged in substantial gainful activity since her application date. (Tr. 15). He found she had severe impairments of somatoform disorder, generalized anxiety disorder, major depressive disorder, and Tourette's syndrome, but none of these impairments—individually or in combination—met or medically equaled a listed impairment. *Id.* The ALJ then concluded Plaintiff had the residual functional capacity ("RFC"):

> to perform a full range of work at all exertional levels but with the following nonexertional limitations: She retains the ability to perform simple and routine tasks that are not fast paced. She can interact with the general public, coworkers and supervisors on a superficial basis. Superficial means the job cannot require arbitration, negotiation, or conflict resolution; management or supervision of others; or responsibility for the health, safety, or welfare of others. She retains the ability to perform in a static work environment that does not require strict production demands. She will be off-task less than 10% of the workday.

(Tr. 17). The ALJ found Plaintiff had no past relevant work, was 31 years old (a "younger individual" pursuant to the regulations, 20 C.F.R. § 416.963), had a limited education and was able

to communicate in English. (Tr. 22). Relying on testimony from the VE, the ALJ concluded Plaintiff could perform jobs that exist in significant numbers in the national economy, namely: housekeeper, dishwasher, or groundskeeper. (Tr. 22-23). Therefore, the ALJ concluded Plaintiff was not disabled. (Tr. 23).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

## STANDARD FOR DISABILITY

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner

follows a five-step evaluation process—found at 20 C.F.R. § 416.920—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. § 416.920(b)-(f); *see also Walters*, 127 F.3d at 529.

## DISCUSSION

Plaintiff raises a single objection to the ALJ's decision: that he failed to properly evaluate the opinion of her treating physician, Dr. Pandya. The Commissioner responds that the ALJ's decision is supported by substantial evidence. For the reasons discussed below, the undersigned finds the ALJ failed to properly evaluate Dr. Pandya's opinion and recommends the Court reverse and remand the Commissioner's decision.

<u>Treating Physician Opinion</u>

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: 1) medically acceptable clinical and laboratory diagnostic techniques; and 2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec*., 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin*., 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of

the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011).

An ALJ's brief explanation may satisfy the good reasons requirement, if that brief analysis touches on the required factors. *See Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009). However, a conclusory statement that a treating physician's opinion is inconsistent with the record is insufficient to satisfy the rule. *See Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551 (6th Cir. 2010). "Put simply, it is not enough to dismiss a treating physician's opinion as 'incompatible' with other evidence of record; there must be some effort to identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Id.* at 552.

In his analysis, the ALJ summarized Dr. Pandya's questionnaire and explained his reasons for the weight assigned:

> Dr. Pandya opined [Plaintiff] was seriously limited to maintain attention and concentration for extended periods, perform at a consistent pace, or get along with coworkers or peers without distracting them. She was unable to meet competitive standards for completing a normal workday or workweek without interruptions from psychologically based symptoms. The claimant would be absent 5-7 days a week due to her impairments or treatments and she would be off-task 50% of the workday. The undersigned notes this opinion does not comport with Dr. Pandya's treatment records, so it does not get controlling weight or great weight. The conclusions that she would be off task 50% of the workday and absent 5-7 days a week are extreme and yet entirely conclusory and speculative.

(Tr. 21).

In *Allen*, the Sixth Circuit found sufficient a one-sentence explanation for discounting a treating physician's opinion, where that explanation was:

> Dr. McCord merely affirmed that it might be reasonable to conclude the claimant's symptoms had remained unchanged since December of 2003, an opinion the

> undersigned found to be speculative since Dr. McCord had not seen the claimant
> for the first time until some two years later, on December 8, 2005.

561 F.3d at 651. The court explained, that "[w]hile this stated reason may be brief, it reaches several of the factors that an ALJ must consider when determining what weight to give a non-controlling opinion by a treating source[.]" *Id.* By contrast, the ALJ's explanation here simply stated that Dr. Pandya's opinion "does not comport" with his treatment records and that some of his opinions were "extreme and yet entirely conclusory and speculative." (Tr. 21). Although the ALJ stated Dr. Pandya's opinion was inconsistent with his treatment records, the ALJ fails to "identify the specific discrepancies and to explain why it is the treating physician's conclusion that gets the short end of the stick." *Friend*, 375 F. App'x at 552. The Commissioner is correct that the ALJ addressed Dr. Pandya's treatment records on the prior page. *See* Tr. 20. However, the ALJ's discussion of those records is simply a rote recitation of what they contained, without any analysis by the ALJ. *Compare*, *e.g.*, *Daniels v. Comm'r of Soc. Sec.*, 2014 WL 1304940, *12 (N.D. Ohio) ("The ALJ's discussion of the medical evidence was not merely a rote recitation of Plaintiff's longitudinal history; rather the ALJ analyzed the medical evidence and explained how it supported his ultimate RFC determination."). Thus, the Commissioner's statement that "[t]he ALJ need not refer again to *specific inconsistencies* when those were listed earlier in the decision" (Doc. 14, at 20) (emphasis added), is a post-hoc gloss on the ALJ's decision.[4] The ALJ never provided any analysis of such alleged inconsistencies within his discussion of Dr. Pandya's records.

---

4. And, the Commissioner's citation to *Crum v. Comm'r of Soc. Sec.*, 660 F. App'x 449, 457 (6th Cir. 2016) is distinguishable. There, the Sixth Circuit explained, an ALJ's statement that a treating physician's opinion was "not consistent with the past treatment records" was supported where, "[e]lsewhere in her decision, the ALJ laid out in detail the treatment records that showed Crum could return to normal work activity", including specific statements by both providers and from the claimant himself that he could return to work. *Id.* By contrast, here, the records summarized by the ALJ show ongoing symptoms, and no such explicit statements about ability to work.

In his discussion of Dr. Pandya's treatment records, the ALJ provides no analysis of how he found those records to support or contradict his RFC. *See* Tr. 20. And, although the Commissioner points to those portions of the records that support a conclusion of non-disability, there are portions of those records summarized within the ALJ's decision that could also support Dr. Pandya's conclusions. *See, e.g.*, Tr. 20 ("There were abnormal involuntary movements including tics of eyes, face and neck" and "Her mood was anxious and depressed. [Her] affect appeared blunted.") (citing Tr. 423-24); Tr. 20 ("The claimant stated on July 29, 2015 that she did not feel the [medication] had been helpful for her tics and anxiety.") (citing Tr. 427); Tr. 20 ("Her eye-blinking and shoulder/upper extremity tics impair her ability to drive and function adequately.") (citing Tr. 437-38). The ALJ provided no explanation for why he found Dr. Pandya's opinion—that Plaintiff was seriously limited in maintaining attention and concentration, performing at a consistent pace, or getting along with coworkers without distracting them, and unable to meet competitive standards in completing a normal workday or workweek—inconsistent with his treatment records. This is error. *See Friend*, 375 F. App'x at 552; *see also, e.g.*, *Dunham v. Comm'r of Soc. Sec.*, 2017 WL 4769010, at *4 (S.D. Ohio) ("Insofar as the ALJ found [the treating physician's] opinion inconsistent with the evidence of record or unsupported by his treatment notes, the ALJ fails to cite to any specific treatment note or other part of the record in support of such a conclusory contention. Such failure is error.").

Although the Commissioner provides several explanations that the ALJ *could have* offered for his rejection of Dr. Pandya's opinion—that he only saw Plaintiff in person a few times; he did not perform any diagnostic testing; his opinion identified "severe tics" while his treatment notes do not suggest this level of severity, and that his opinion seemed to be based on Plaintiff's subjective representations, which were not entirely credible, *see* Doc. 14, at 14-17—the ALJ

himself did not offer these reasons in his analysis of Dr. Pandya's opinion. Thus, this Court adopting such analysis would be an improper post-hoc rationalization of the ALJ's decision. *See Williams v. Comm'r of Soc. Sec.*, 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety solely by the grounds invoked by the agency); *see also Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) ("The treating physician rule requires an explanation by the SSA, not the court.").

The ALJ's opinion, even taken as a whole, does not afford this Court the opportunity to meaningfully review the ALJ's assessment of Dr. Pandya's opinion. There may well be good reasons for discounting that opinion, but they are not found in the ALJ's decision. As such, remand is required.

Other Arguments

Within her argument that the ALJ violated the treating physician rule, Plaintiff also presents several additional arguments that the undersigned addresses briefly.

First, Plaintiff objects to the ALJ's consideration of Dr. Deardorff's opinion, contending "the ALJ only gave Dr. Deardorff's opinion weight to the extent that *Dr. Deardorff did not disagree with him*." (Doc. 13, at 13) (emphasis in original). As noted above, Dr. Deardorff, a consultative examiner, concluded Plaintiff had no difficulty with simple questions or instructions, but poor short term memory, and poor performance on assessments of attention and concentration skills. (Tr. 202). He also noted she had anxiety, and stated she "had difficulty interacting with others at school and on the job due to her belief that she is ridiculed by others." *Id.* The ALJ summarized this opinion, and stated he

gave weight to Dr. Deardorff's opinions to the extent that they helped persuade me that the claimant's residual functional capacity need not contain any restriction greater than, or in addition to, those stated in Finding #4 above. The undersigned did so because his opinions were consistent with his clinical findings and he is an expert in Social Security Disability evaluation[.]

(Tr. 21). The ALJ's RFC largely comported with Dr. Deardorff's limitations—restricting Plaintiff to simple, routine, non-fast-paced tasks, no strict production demands, and only superficial interaction with others. *See* Tr. 17. And, as a consultative examiner and not a treating physician, the ALJ was not required to give "good reasons" for the weight assigned. *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). The undersigned finds no error in the ALJ's consideration of Dr. Deardorff's opinion.

Second, Plaintiff objects to the ALJ's decision to give "great weight" to the state agency reviewing physicians when "they did not have the opportunity to review a year's worth of medical records . . ." (Doc. 13, at 14). This is not per se error as Plaintiff suggests. And ALJ may give an opinion great weight even though it is earlier in time, so long as the ALJ considers the record as a whole. *See Gibbens v. Comm'r of Soc. Sec.*, 659 F. App'x 238, 248 (6th Cir. 2016) (finding no error in giving great weight to an earlier state agency reviewing physician opinion when "the ALJ's own analysis clearly spanned the entire record"). Furthermore, state agency reviewing physicians are considered experts, and their opinions may, at times, be entitled to greater weight than treating or examining physicians when the opinions are supported by the evidence. *See Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016) ("State agency medical consultants . . . are highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act"; thus, in some cases, "an ALJ may assign greater weight to a state agency consultant's opinion than to that of a treating . . . source.") (internal

quotation marks omitted). Here, the ALJ's analysis spanned the entire record, so his decision to give great weight to the earlier state agency opinions was not error.

Third, Plaintiff contends that the ALJ "did the one thing that is not permitted, namely rely upon his lay analysis of the raw medical data." (Doc. 13, at 15). She contends the ALJ "could have arranged for an additional consultative examination, enlisted a review of the record and testimony from a medical expert, re-contacted Drs. Pandya or Deardorff, or sent the entire case record . . . back to the State Agency for review." *Id.* The regulations provide that the Commissioner will determine whether the evidence provided is "insufficient" to make a determination. 20 C.F.R. § 416.920b ("We consider evidence to be insufficient when it does not contain all the information we need to make our determination or decision."); *see also* 20 C.F.R. § 416.920b(c) ("If . . . we have insufficient evidence to determine whether you are disabled . . . we will determine the best way to resolve the . . . insufficiency."). If, however, the record is sufficient, but inconsistent, the ALJ may make a determination based on the record evidence. *See* 20 C.F.R. § 416.920b(b) ("If any of the evidence in your case record . . . is inconsistent, we will weigh the relevant evidence and see whether we can determine whether you are disabled based on the evidence we have."). The ALJ here evaluated the evidence of record and reached a conclusion (although, as discussed above, he erred in his consideration of Dr. Pandya's opinion). There is nothing to suggest the evidence presented was insufficient to make a determination. As such, the ALJ did not err by failing to seek additional evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying SSI not supported by substantial evidence

and recommends the decision be reversed and remanded pursuant to Sentence Four of 42 U.S.C. § 405(g).

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).